UNITED STATES of America, Appellee,

v.

Frank QUATTRONE, Defendant,

Forbes Inc., ABC, Inc., the Associated Press, Cable News Network L.P., L.L.L.P., Daily News, L.P., the Hearst Corporation, the McGraw–Hill Companies, Inc., National Broadcasting Company, Inc., Newsday, Inc., the New York Times Company, the Washington Post Co., the New York Press Club, Inc., Appellants.

Docket No. 04–2432–CR.

United States Court of Appeals, Second Circuit.

Argued: Nov. 2, 2004.

Decided: March 22, 2005.

Floyd Abrams, Cahill Gordon & Reindel LLP (Joel Kurtzberg, Cahill Gordon & Reindell; David A. Schulz, Alia L. Smith, Levine Sullivan Koch & Schulz LLP, on the brief), New York, NY, for appellants.

Jacob W. Buchdahl, Assistant United States Attorney for the Southern District of New York (David B. Anders, Celeste L. Koeleveld, Assistant United States Attorneys; David N. Kelley, United States Attorney, on the brief), New York, NY, for appellee.

Before: CARDAMONE, CABRANES and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Appellant media organizations ("appellants") challenge a prior restraint on publication imposed by the United States District Court for the Southern District of New York (Owen, J.).[1] The district court, in an effort to protect the integrity of a criminal trial, forbade appellants and other members of the media from publishing, during the pendency of the trial, jurors' names that were disclosed in open court. Because nothing in the record justified an exception to the First Amendment doctrines that bar prior restraints and protect the right to report freely on information disclosed in open court proceedings, we hold that the district court's order violated the Free Speech and Free Press Clauses of the First Amendment.

---

1. The appellant news organizations are Forbes, Inc., ABC, Inc., the Associated Press, Cable News Network L.P., L.L.L.P., the Daily News, L.P., the Hearst Corporation, the McGraw–Hill Companies, Inc., NBC Universal, Inc., Newsday, Inc., the New York Times Company, the Washington Post and the New York Press Club, Inc.

## BACKGROUND

This appeal arises out of the retrial of Frank Quattrone, a former executive of Credit Suisse First Boston ("CSFB") who was accused, and later convicted, of obstructing the federal government's investigation of CSFB's initial public offerings of certain technology companies. Quattrone had directed members of his staff to "clean up" files after he learned that the Securities and Exchange Commission had issued subpoenas to CSFB and various of its employees. After Quattrone's first trial ended with a hung jury in October 2003, Judge Richard Owen of the United States District Court for the Southern District of New York scheduled a retrial for the following April.

Shortly before Quattrone's retrial, a state court judge declared a mistrial in the separate but similarly high-profile prosecution of Dennis Kozlowski, a former chief executive of Tyco Corporation. *See* Andrew Ross Sorkin et al., *The Tyco Mistrial: The Overview*, N.Y. Times, Apr. 3, 2004, at A1. Near the close of the Kozlowski trial, several publications, including the New York Post and the Wall Street Journal's online edition, had disclosed the name of a juror who, according to press reports, had signaled support for defendant Kozlowski through a hand gesture made in open court. In addition to disclosing her name, several media outlets published personal and unflattering information about the juror that they had obtained from her neighbors and from her apartment building's concierge. Soon after this publicity began, the juror received an anonymous phone call asking her how much the "Kozlowski team" was paying her. Anthony M. DeStefano, *Tyco Mistrial: Judge Seals Note to Juror No. 4*, Newsday, Apr. 8, 2004, at A7. She also received a letter at her home address, the contents of which, she later told the court, alarmed and frightened her. *See id.* The state court judge declared a mistrial, citing the "pressure that ha[d] been brought to bear on one woman whose name and background [had been] widely publicized," and voicing his regret that the court had been unable to "protect the process sufficiently to permit" the jury to reach a verdict. Karen Freifeld, *Tyco Trial Ends*, Newsday, Apr. 3, 2004, at A3; Sorkin et al., *supra*.

On April 7, 2004—less than a week after the widely-reported Kozlowski mistrial—Judge Owen held a final pretrial conference in the Quattrone case, where he rejected a last-minute request from Quattrone to empanel an "anonymous jury"—that is, a jury whose members' names would not be revealed to the parties, to counsel or to the public. The judge indicated, however, that "[i]f [he had] the power to do it," he would grant Quattrone's request for an order barring the press from publishing the names of jurors. Appellant's Appendix ("Appendix") at 53. The government cautioned the court that such an order might constitute a prior restraint on speech in conflict with the First Amendment.

On April 13, 2004, in a colloquy before the start of *voir dire*, Judge Owen informed counsel that he would order the press to refrain from publicly revealing any juror's name. The government advised the district court that the press was likely to contest the order, but Judge Owen remained firm in his position, stating that he wished to avoid a mistrial as had occurred in the Kozlowski case.

During jury selection, Judge Owen stated in open court the full names of the first twelve potential jurors. The judge then declared:

> Ladies and gentlemen of the jury panel, and any members of the media, should there be any in the room or outside of the room and have notice of what I'm

about to say, I am preserving that it's an order of this Court that no member of the press or a media organization is to divulge at any time until further order of this Court the name of any prospective or selected juror. And that's to anybody who has notice of it, and I'm sure that's going to be communicated around.

Appendix at 122. Before jury selection resumed the following morning, counsel for several media organizations submitted a letter objecting to the court's order and requesting an immediate opportunity to be heard. The court agreed to hold a hearing at the end of the day. Throughout that day, the court continued to identify prospective jurors by name in open court.

The judge addressed the media's objections in a hearing on the record held in his robing room at the end of the day. In explaining the order, Judge Owen left no doubt that his primary concern was the possibility of a repeat of the Kozlowski incident, in which, Judge Owen explained, a six-month trial was "absolutely destroyed" and "blown out of the water by a publication of [a juror's] name." Appendix at 356, 361. Clarifying that the restrictions on the press would "terminate[ ] the minute the case is over," and emphasizing the need to "give[ ] both the prosecution and the defense the fairest possible trial," the court refused to vacate its earlier order prohibiting the publication of jurors' names. *Id.* at 366. A coalition of news organizations appealed.[2]

## DISCUSSION

A judicial order forbidding the publication of information disclosed in a public judicial proceeding collides with two basic First Amendment protections: the right against prior restraints on speech and the right to report freely on events that transpire in an open courtroom. Because nothing in this case justified the district court's infringement of these two central freedoms, we hold that the court's order violated the Free Speech and Free Press Clauses of the First Amendment.[3]

### A.

 Before elaborating on the merits, we address our jurisdiction to hear this appeal. Under Article III of the Constitution, we may exercise jurisdiction only over live cases and controversies. *See ABC, Inc. v. Stewart*, 360 F.3d 90, 97 (2d Cir.2004). Because Quattrone's trial has ended and the district court's order has, by its own terms, dissolved, a question necessarily arises as to whether this appeal remains justiciable. Ordinarily, if an event occurs during the course of the proceedings or on appeal " 'that makes it impossible for the court to grant any effectual relief whatever to a prevailing party,' we must dismiss the case." *Id.* (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (further internal quotation marks omitted)).

---

**2.** The government, which submitted an appellate brief pursuant to an order of this Court, has not contested the arguments set forth by appellants on appeal. Instead, the government has referred to its acknowledgment below that "the restraint that the Court … imposed might very well be unlawful," i.e., "[u]nconstitutional." Appendix at 369–70.

**3.** The First Amendment provides: "Congress shall make no law … abridging the freedom of speech, or of the press …." There is no question that the Amendment applies to judicial orders such as the order issued in this case. *See Alexander v. United States*, 509 U.S. 544, 550, 553 n. 2, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418–19, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971).

■ Despite this general rule of mootness, the instant appeal, like the appeal in *Stewart,* remains justiciable, because "the underlying dispute is 'capable of repetition, yet evading review.'" *Id.* (quoting *Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 6, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986)). This exception to the mootness doctrine permits federal courts to decide a case where "(1) the challenged action was in duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Id.* (alterations, citation and internal quotation marks omitted).[4] We agree with appellants that the order at issue in this case was too short in duration to be fully litigated prior to its expiration, and that there is a reasonable expectation that these same appellants will face a similar restrictive order in the future.

### B.

■ Turning to the merits, we discuss first the doctrine of prior restraints. A "prior restraint" on speech is a law, regulation or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression. *See Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993); *Hobbs v. County of Westchester,* 397 F.3d 133, 148 (2d Cir.2005); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees and Rest. Employees Int'l Union,* 239 F.3d 172, 176 (2d Cir.2001); *In re G. & A. Books, Inc.,* 770 F.2d 288, 295–96 (2d Cir.1985); *see also Alexander,* 509 U.S. at 566–72, 113 S.Ct. 2766 (Kennedy, J., dissenting) (discussing the distinction between prior restraints and subsequent punishments and the utility of that distinction).[5] It has long been established that such restraints constitute "the most serious and the least tolerable infringement" on our freedoms of speech and press. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *see also Tunick v. Safir,* 209 F.3d 67, 91 (2d Cir.2000) (quoting *Nebraska Press,* 427 U.S. at 559, 96 S.Ct. 2791). Indeed, the

---

**4.** Our discussion in *Stewart* further suggests that the exception may be invoked where there is a reasonable expectation that comparable or similarly-situated parties will be subjected to the same action. 360 F.3d at 97–98.

**5.** Though we define prior restraints as content-based restrictions for purposes of this decision, we recognize that the caselaw has not clearly articulated whether prior restraints are always, by definition, content-based. *Compare In re G. & A. Books, Inc.,* 770 F.2d at 295–96 ("Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated."), *and Alexander,* 509 U.S. at 566, 113 S.Ct. 2766 (Kennedy, J., dissenting) ("In its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official who may grant or deny permission to utter or publish it based upon its contents."), *with Encore Videos, Inc. v. City of San Anto-*nio, 330 F.3d 288, 290, 291 (5th Cir.2003) ("Even a content-neutral regulation may be considered a prior restraint if it gives government officials 'unbridled discretion' to restrict protected speech."), *and Hobbs,* 397 F.3d at 148–49 (discussing separately the First Amendment's bar on prior restraints and its bar on content-based restrictions, and defining "prior restraint" as "any regulation that g[i]ve[s] public officials the power to deny use of a forum in advance of actual expression" (alteration in original) (citation and internal quotation marks omitted)). The instant case does not require us to resolve any inconsistencies in the precise definition of "prior restraint," however, because it is beyond question that the order here was explicitly content-based and that it fits squarely within the Supreme Court's definitions of the term "prior restraint." *See, e.g., Alexander,* 509 U.S. at 550, 113 S.Ct. 2766.

Supreme Court has described the elimination of prior restraints as the " 'chief purpose' " of the First Amendment. *Gannett Co. v. DePasquale,* 443 U.S. 368, 393 n. 25, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (quoting *Near v. State of Minnesota ex rel. Olson,* 283 U.S. 697, 713, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)); *see also Nebraska Press,* 427 U.S. at 557, 96 S.Ct. 2791 (" 'The main purpose of the First Amendment is to prevent all such previous restraints upon publications as had been practiced by other governments.' " (brackets, emphasis and further internal quotation marks omitted) (quoting *Patterson v. Colorado ex rel. Attorney Gen.,* 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907))). Any imposition of a prior restraint, therefore, bears "a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *United States v. Salameh,* 992 F.2d 445, 446–47 (2d Cir.1993) (per curiam).[6] Moreover, because a " 'responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field,' " the protection against prior restraint carries particular force in the reporting of criminal proceedings. *Nebraska Press,* 427 U.S. at 559–60, 96 S.Ct. 2791 (quoting *Sheppard v. Maxwell,* 384 U.S. 333, 350, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)). A prior restraint is not constitutionally inoffensive merely because it is temporary. *See Alexander,* 509 U.S. at 550, 113 S.Ct. 2766; *Nebraska Press,* 427 U.S. at 559, 96 S.Ct. 2791.

■■ Though the First Amendment's hostility to prior restraints has sometimes been described in absolute terms, *see, e.g., Patterson,* 205 U.S. at 462, 27 S.Ct. 556, the Supreme Court has held that in exceptional cases, a prior restraint may survive constitutional scrutiny. *See Nebraska Press,* 427 U.S. at 562, 96 S.Ct. 2791. One exception, for example, might arise where the speech at issue falls into a category of expression that lies outside of the First Amendment's broad protections. *See id.* at 590, 96 S.Ct. 2791 (Brennan, J., concurring in the judgment). Thus, a prior restraint on the dissemination of child pornography is likely to survive First Amendment scrutiny, *see New York v. Ferber,* 458 U.S. 747, 763–64, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), at least where "adequate and timely procedures" exist "to protect against any restraint of speech that does come within the ambit of the First Amendment," *Nebraska Press,* 427 U.S. at 591, 96 S.Ct. 2791 (Brennan, J., concurring in the judgment). Where the category of speech otherwise receives First Amendment protection, however, courts subject prior restraints on speech or publication to exacting review. In cases where, as here, a trial court seeks to restrict news coverage in order to en-

---

**6.** As the Supreme Court explained in *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975):

The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Id.* at 558–59, 95 S.Ct. 1239. *But see* John Calvin Jeffries, Jr., *Rethinking Prior Restraint,* 92 Yale L.J. 409 (1983) (criticizing jurisprudence of prior restraints and questioning rationale behind the Supreme Court's special hostility toward them), *cited in Alexander,* 509 U.S. at 567, 113 S.Ct. 2766 (Kennedy, J., dissenting) (noting criticisms of the doctrine of prior restraints).

sure a fair trial, the court must consider: (1) whether the nature and extent of news coverage in question would impair the defendant's right to a fair trial; (2) whether measures other than a prior restraint on publication exist to mitigate the effects of unrestricted publicity; and (3) the likely efficacy of a prior restraint to prevent the threatened danger. *See Nebraska Press*, 427 U.S. at 562, 96 S.Ct. 2791; *see also Salameh*, 992 F.2d at 447 ("This Court has stated that before a district court issues a blanket prior restraint, it must, *inter alia*, explore whether other available remedies would effectively mitigate the prejudicial publicity, and consider the effectiveness of the order in question to ensure an impartial jury." (citations and internal quotation marks omitted)). The reviewing court must examine closely both the record and the "precise terms" of the restrictive order. *Nebraska Press*, 427 U.S. at 562, 96 S.Ct. 2791. Application of the *Nebraska Press* test to the instant case demonstrates that the district court's order violated appellants' First Amendment rights.

■ As to the first prong of *Nebraska Press*, we note that the district court did not make factual findings that publicity in this case would impair defendant's Sixth Amendment right to a fair trial. On the contrary, Judge Owen acknowledged that there had been no instance of juror harassment in Quattrone's first trial and stated that he "respect[ed] and trust[ed]" that the media organizations were not planning to disrupt the second trial. Appendix at 366, 368. The court appears to have based the

prior restraint entirely on the incidents of the Kozlowski trial. While it is not improper for a district judge to take into account his or her "common human experience" or to make reasonable "speculat[ions]" in assessing the likely impact of news coverage, *see Nebraska Press*, 427 U.S. at 562–63, 96 S.Ct. 2791, a judge may not impose a prior restraint based solely on incidents that occurred in a completely separate and unrelated, albeit temporally proximate, trial. *Cf. In re Application of N.Y. Times Co.*, 878 F.2d 67, 67–68 (2d Cir.1989) (per curiam) (holding that district court's experience with problematic pretrial publicity in past cases did not justify prohibiting attorney communications with press in case at bar).

■ Second, though the district court considered and rejected the possibility of an anonymous jury,[7] the record does not demonstrate sufficient consideration of measures other than a prior restraint that could have mitigated the effects of the perceived harm. *See Nebraska Press*, 427 U.S. at 563–65, 96 S.Ct. 2791; *Salameh*, 992 F.2d at 447. Possible alternatives to the prior restraint may have included, *inter alia*, changing the trial venue to a jurisdiction where media scrutiny may have been less intense, *see Nebraska Press*, 427 U.S. at 563, 96 S.Ct. 2791; "postponement of the trial to allow public attention to subside," *id.* at 563–64, 427 U.S. 539; emphatic warnings to the press and parties about the impropriety of contacting jurors during trial; sequestering the jury, *see id.* at 564, 96 S.Ct. 2791; *see also Des Moines Register & Tribune Co. v.*

---

7. Where there is "strong reason to believe the jury needs protection," a court may maintain the jury's anonymity, provided that the court takes "reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his [or her] fundamental rights are protected." *United States v. Wong*, 40 F.3d 1347, 1376 (2d Cir.1994); *see also Unit-* ed States v. Vario, 943 F.2d 236, 240 (2d Cir.1991) ("Pre-trial publicity may militate in favor of an anonymous jury because it can enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public." (citation and internal quotation marks omitted)).

*Osmundson,* 248 N.W.2d 493, 500 (Iowa 1976); or temporarily closing the proceedings, *see ABC, Inc. v. Stewart,* 360 F.3d 90, 98–99 (2d Cir.2004) (citing, *inter alia, Press–Enter. Co. v. Superior Court,* 464 U.S. 501, 504–10, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)).[8] We intimate no view on whether such measures would have been prudent or permissible under the facts of this case. We merely note that the district court did not, as required, sufficiently consider possible alternatives to issuing a prior restraint, "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press,* 427 U.S. at 562, 96 S.Ct. 2791.

The third prong of *Nebraska Press,* which relates to the "efficacy" of a prior restraint, presents a somewhat closer question. *Id.* at 565, 96 S.Ct. 2791. Intuitively, the imposition of a prior restraint on the publication of jurors' identities seems likely to reduce the risk of juror harassment or other disruption of the trial. We find it significant, however, that the jurors' names here were read aloud in open court. Regardless of restrictions on the press, therefore, any member of the public present in the courtroom could have learned the jurors' names and disseminated that information as widely as possible. *See State, ex rel. N.M. Press v. Kaufman,* 98 N.M. 261, 648 P.2d 300, 306 (1982) ("[S]ince the names of the jurors were announced in open court and filed as a public record, the procedures failed the third prong of the [*Nebraska Press*] test."); *see also Commonwealth v. Genovese,* 337 Pa.Super. 485, 487 A.2d 364, 369 (1985) ("Anyone bent upon intimidating jurors in this case could readily have ascertained their identity by the simple

expedient of being present in the courtroom during [*voir dire* ] and jury selection. The court's order restraining the news media ... was certainly not effective to protect them from intimidation."). Thus, the ability of the court's order to satisfy the third prong of *Nebraska Press* is dubious at best.

Finally, we note that the lack of notice or opportunity to be heard normally renders a prior restraint invalid. *See Carroll v. President & Com'rs of Princess Anne,* 393 U.S. 175, 180, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). Here, the district court erred by failing to give prior notice and by waiting a full day after imposition of the prior restraint before granting a hearing on its merits.

Given the district court's failure to satisfy the three-prong *Nebraska Press* inquiry and its failure to grant prior notice to the media, we conclude that the court's order constituted an unlawful prior restraint in violation of appellants' First Amendment rights.

## C.

The district court's order barring publication of jurors' names not only subjected appellants to a prior restraint on speech, but also infringed their freedom to publish information disclosed in open court. This imposed an independent constitutional harm on appellants and rendered the district court's violation of the First Amendment even more plain.

As the Supreme Court explained in *Craig v. Harney,* 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947):

---

**8.** The " 'presumption of openness' " in *voir dire* proceedings " 'may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that inter-

est.' " *Stewart,* 360 F.3d at 98 (quoting *Press–Enter,* 464 U.S. at 510, 104 S.Ct. 819); *see also id.* at 98–99 (describing further limitations on closure where the asserted competing interest is the right to a fair trial).

A trial is a public event. What transpires in the court room is public property.... Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.

*Id.* at 374, 67 S.Ct. 1249. The Court used similarly emphatic language in *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), a case in which a reporter had published the name of a seventeen-year-old rape victim after learning her name through an inspection of documents made available in the courtroom. *Id.* at 472, 95 S.Ct. 1029. The Court held that "[a]t the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." *Id.* at 496, 95 S.Ct. 1029. While acknowledging that in limited circumstances, a court might restrict the information available to the public to protect important interests, the Court concluded that "[o]nce true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it." *Id.; see also Okla. Publ'g Co. v. Dist. Court,* 430 U.S. 308, 310, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977) ("[T]he First and Fourteenth Amendments will not permit a state court to prohibit the publication of widely disseminated information obtained at court proceedings which were in fact open to the public."); *cf. Fla. Star v. B.J.F.,* 491 U.S. 524, 526, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (holding that First Amendment precluded damages action brought by rape victim against newspaper for publishing victim's name when name was obtained from publicly released police report).

*Nebraska Press* further reinforced these principles. After concluding that the district court's restrictive order failed the three-part inquiry described above, *see supra* Part B, the Supreme Court took particular issue with those portions of the district court order that had been directed at information disclosed at an open hearing:

> Finally, another feature of this case leads us to conclude that the restrictive order entered here is not supportable....
>
> To the extent that th[e] order prohibited the reporting of evidence adduced at the open preliminary hearing, it plainly violated settled principles: "There is nothing that proscribes the press from reporting events that transpire in the courtroom." The County Court could not know that closure of the preliminary hearing was an alternative open to it until the Nebraska Supreme Court so construed state law; but once a public hearing had been held, what transpired there could not be subject to prior restraint.

427 U.S. at 567–68, 96 S.Ct. 2791 (alteration and citations omitted).

We need not address what exceptional circumstances, if any, could justify a departure from the doctrine barring restrictions on the publication of information revealed in open court. It suffices to hold that the record is devoid of facts that could justify creating such an exception in this case.

## CONCLUSION

While we appreciate the district court's efforts to avoid an unfair or disorderly trial, the freedoms of speech and press invariably must inform a court's choice of remedy. Because the facts of this case did not justify the imposition of a prior re-

straint or an infringement of appellants' right to publish information disclosed in open court, we hold that the district court's order violated the Free Speech and Free Press Clauses of the First Amendment.