**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMERICANS FOR PROSPERITY
FOUNDATION,
        *Plaintiff-Appellee*,

v.

XAVIER BECERRA, in his
Official Capacity as Attorney
General of the State of
California,
        *Defendant-Appellant.*

No. 16-55727

D.C. No.
2:14-cv-09448-R-FFM

---

AMERICANS FOR PROSPERITY
FOUNDATION,
        *Plaintiff-Appellant*,

v.

XAVIER BECERRA, in his
Official Capacity as Attorney
General of the State of
California,
        *Defendant-Appellee.*

No. 16-55786

D.C. No.
2:14-cv-09448-R-FFM

THOMAS MORE LAW CENTER,
*Plaintiff-Appellee*,

v.

XAVIER BECERRA, in his
Official Capacity as Attorney
General of the State of
California,
*Defendant-Appellant.*

No. 16-56855

D.C. No.
2:15-cv-03048-R-FFM

THOMAS MORE LAW CENTER,
*Plaintiff-Appellant*,

v.

XAVIER BECERRA, in his
Official Capacity as Attorney
General of the State of
California,
*Defendant-Appellee.*

No. 16-56902

D.C. No.
2:15-cv-03048-R-FFM

ORDER DENYING
PETITIONS FOR
REHEARING EN
BANC

Filed March 29, 2019

Before:  Raymond C. Fisher, Richard A. Paez,
and Jacqueline H. Nguyen, Circuit Judges.

Order;
Dissent by Judge Ikuta;
Reply to Dissent by Judges Fisher, Paez, and Nguyen

## SUMMARY[*]

### Civil Rights

The panel denied petitions for rehearing en banc on behalf of the court.

In its opinion, the panel held that California Attorney General's Service Form 990, Schedule B requirement, which obligates charities to submit the information they file each year with the Internal Revenue Service pertaining to their largest contributors, survived exacting scrutiny as applied to the plaintiffs because it was substantially related to an important state interest in policing charitable fraud.

Dissenting from the denial of rehearing en banc, Judge Ikuta, joined by Judges Callahan, Bea, Bennett and R. Nelson, stated that the panel's reversal of the district court's decision was based on appellate factfinding and was contrary to the reasoning and spirit of decades of Supreme Court jurisprudence, which affords substantial protections to persons whose associational freedoms are threatened. Judge Ikuta wrote that under the panel's analysis, the government can put the First Amendment associational rights of members and contributors at risk for a list of names it does not need, so long as it promises to do better in the future to avoid public disclosure of the names. Judge Ikuta wrote that given the inability of governments to keep data secure, the panel's standard puts anyone with controversial views at risk.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Responding to the dissent from the denial of rehearing en banc, Judge Fisher, Paez and Nguyen stated that the panel's decision to apply exacting scrutiny was consistent with Supreme Court precedent, Ninth Circuit precedent, and out-of-circuit precedent. The panel noted that the two circuits that have addressed the issue both have held that exacting, rather than strict scrutiny apply and that the nonpublic Schedule B reporting requirements satisfy the First Amendment because they allow state and federal regulators to protect the public from charitable fraud without subjecting major contributors to the threats, harassment or reprisals that could flow from public disclosure.

**ORDER**

Judge Paez and Judge Nguyen have voted to deny the petitions for rehearing en banc and Judge Fisher has so recommended.

The full court was advised of the petitions for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petitions for rehearing en banc (Nos. 16-55727 and 16-55786, filed September 25, 2018 - Dkt. 106; and Nos. 16-56855 and 16-56902, filed September 26, 2018 - Dkt. 67) are **DENIED**.

IKUTA, Circuit Judge, with whom CALLAHAN, BEA, BENNETT, and R. NELSON, Circuit Judges, join, dissenting from denial of rehearing en banc:

Controversial groups often face threats, public hostility, and economic reprisals if the government compels the organization to disclose its membership and contributor lists. The Supreme Court has long recognized this danger and held that such compelled disclosures can violate the First Amendment right to association. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

For this reason, the Supreme Court has given significant protection to individuals who may be victimized by compelled disclosure of their affiliations. Where government action subjects persons to harassment and threats of bodily harm, economic reprisal, or "other manifestations of public hostility," *NAACP v. Alabama*, 357 U.S. at 462, the government must demonstrate a compelling interest, *id.* at 463; *Bates v. Little Rock*, 361 U.S. 516, 524 (1960), there must be a substantial relationship between the information sought and the compelling state interest, *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963), and the state regulation must "be narrowly drawn to prevent the supposed evil," *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 297 (1961) (internal quotation marks omitted) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 307 (1940)).

This robust protection of First Amendment free association rights was desperately needed here. In this case, California demanded that organizations that were highly controversial due to their conservative positions disclose most of their donors, even though, as the district court found, the state did not really need this information to accomplish its

goals. Although the state is required to keep donor names private, the district court found that the state's promise of confidentiality was illusory; the state's database was vulnerable to hacking and scores of donor names were repeatedly released to the public, even up to the week before trial. *See Ams. for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049, 1057 (C.D. Cal. 2016). Moreover, as the district court found, supporters whose affiliation had previously been disclosed experienced harassment and abuse. *See id.* at 1055–56. Their names and addresses, and even the addresses of their children's schools, were posted online along with threats of violence. Some donors' businesses were boycotted. In one incident, a rally of the plaintiff's supporters was stormed by assailants wielding knives and box cutters, who tore down the rally's tent while the plaintiff's supporters struggled to avoid being trapped beneath it. In light of the powerful evidence at trial, the district court held the organizations and their donors were entitled to First Amendment protection under the principles of *NAACP v. Alabama*. *See id.* at 1055.

The panel's reversal of the district court's decision was based on appellate factfinding and crucial legal errors. First, the panel ignored the district court's factfinding, holding against all evidence that the donors' names would not be made public and that the donors would not be harassed. *See Ams. for Prosperity Found. v. Becerra*, 903 F.3d 1000, 1017, 1019 (9th Cir. 2018) ("*AFPF II*"). Second, the panel declined to apply *NAACP v. Alabama*, even though the facts squarely called for it. *See id.* at 1008–09. Instead, the panel applied a lower form of scrutiny adopted by the Supreme Court for the unique electoral context. *See Buckley v. Valeo*, 424 U.S. 1, 64, 68 (1976). The panel's approach will ensure that individuals affiliated with controversial organizations

effectively have little or no protection from compelled disclosure. We should have taken this case en banc to correct this error and bring our case law in line with Supreme Court jurisprudence.

## I

The Supreme Court has established a clear test for cases like this one. While the Court has modified the test to fit different contexts, it has not wavered from the principle that the First Amendment affords organizations and individuals substantial protection when the government tries to force disclosure of ties that could impact their freedom of association.

## A

The Supreme Court decisions protecting against forced disclosures that threaten individuals' freedom of association arose in a series of cases involving the NAACP. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449; *Bates*, 361 U.S. 516; *Gremillion*, 366 U.S. 293; *Gibson*, 372 U.S. 539. The Court considered numerous attempts by states to compel disclosure of NAACP membership information at a time when those members faced a well-known risk of "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *NAACP v. Alabama*, 357 U.S. at 462; *see also Gremillion*, 366 U.S. at 295–96; *Bates*, 361 U.S. at 523–24.

In this broader context, the Court recognized that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association" as more direct

restrictions on speech. *NAACP v. Alabama*, 357 U.S. at 462.
"[F]reedom of association for the purpose of advancing ideas
and airing grievances is protected by the Due Process Clause
of the Fourteenth Amendment from invasion by the States . . .
not only against heavy-handed frontal attack, but also from
being stifled by more subtle governmental interference."
*Bates*, 361 U.S. at 523 (citations omitted)*.*

Because state disclosure requirements can abridge First
Amendment associational rights, the Court held such
requirements were subject to heightened scrutiny. Once a
plaintiff carries the burden of showing that a state-required
disclosure may result "in reprisals against and hostility to the
members," *Gremillion*, 366 U.S. at 296, the state has to
show: (1) a sufficiently compelling interest for requiring
disclosure, *see NAACP v. Alabama*, 357 U.S. at 462–63;
(2) that the means were substantially related to that interest,
*Gibson*, 372 U.S. at 549; and (3) that the means were
narrowly tailored, *Gremillion*, 366 U.S. at 296. While the
Supreme Court has articulated this three-part test in various
ways, it has made clear that the test affords substantial
protection to persons whose associational freedoms are
threatened.

B

The Court modified the *NAACP v. Alabama* test for
application in the electoral context. *See Buckley*, 424 U.S.
at 64, 68. *Buckley* recognized the importance of applying
"[t]he strict test established by *NAACP v. Alabama* . . .
because compelled disclosure has the potential for
substantially infringing the exercise of First Amendment
rights," but it adjusted the test for government action that
affects elections when the plaintiffs could not establish that

disclosure would subject them to threats or harassment. *Id.* at 66. It makes sense to adapt the *NAACP v. Alabama* test for the electoral context, where the government's interest is uniquely important. Influence in elections may result in influence in government decisionmaking and the use of political power; therefore, the government's crucial interest in avoiding the potential for corruption and hidden leverage outweighs incidental infringement on First Amendment rights. *Id.* at 66–68, 71. The interests served by disclosure outside the electoral context, such as policing types of charitable fraud, pale in comparison to the crucial importance of ensuring our election system is free from corruption or its appearance.

Given the unique electoral context, *Buckley* held that, for the first prong, the governmental interest must be "sufficiently important to outweigh the possibility of infringement" of First Amendment rights; the government did not need to show a compelling government interest. *Id.* at 66. For the second prong, it still held there must be a "substantial relation between the governmental interest and the information required to be disclosed." *Id.* at 64 (footnote and internal quotation marks omitted) (quoting *Gibson*, 372 U.S. at 547).

As to the third prong of the test, *Buckley* fashioned a per se rule: it deemed the disclosure requirement to be "the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Id.* at 68. *Buckley* based this conclusion on its recognition that Congress always has a substantial interest in combating voter ignorance by providing the electorate with information about the sources and recipients of funds used in political campaigns in order to deter actual corruption and avoid the

appearance of corruption, and in gathering data necessary to detect violations of separate political contribution limits. *Id.* at 66–68. Because, "in most applications," disclosure is "the least restrictive means of curbing the evils of campaign ignorance and corruption," the narrow tailoring prong of the *NAACP v. Alabama* test is satisfied. *Id.* at 68.

Recognizing the distinction between elections and other justifications for disclosure, the Supreme Court has applied *Buckley*'s test only in cases that involve election-related disclosures, a context in which the Supreme Court has already established that disclosure is the least restrictive means of reaching Congress's goals. *See, e.g.*, *Doe v. Reed*, 561 U.S. 186, 196–97 (2010); *Citizens United v. FEC*, 558 U.S. 310, 369–70 (2010). These cases did not discuss whether disclosure was narrowly tailored to address the government's concern; *Buckley* already held that it is. For example, *Doe v. Reed* recognized the government's interest in "preserving the integrity of the electoral process" and "promoting transparency and accountability in the electoral process," and thus there was no need to discuss narrow tailoring. 561 U.S. at 197–98. The Court likewise did not focus on the narrow tailoring requirement in *Citizens United*, noting *Buckley*'s holdings that "disclosure could be justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending," and that "disclosure is a less restrictive alternative to more comprehensive regulations of speech." 558 U.S. at 367, 369 (quoting *Buckley*, 424 U.S. at 66).

The Court's limited application of the *Buckley* test, confined to cases in the electoral context in which the government's aim is to serve goals like "transparency and accountability," has not displaced the stringent standard set

out in *NAACP v. Alabama*. Indeed, the *NAACP v. Alabama* standard was likely not triggered in the election cases, given that they did not involve evidence that compelled disclosure would give rise to public hostility to the plaintiff's members or donors. The Court has maintained *NAACP v. Alabama*'s standard outside of the electoral context, thus reasserting the validity of that standard after *Buckley*. *See, e.g.*, *In re Primus*, 436 U.S. 412, 432 (1978) (holding that where a state seeks to infringe upon a party's First Amendment freedom of association, the state must justify that infringement with "a subordinating interest which is compelling" and must use means that are "closely drawn to avoid unnecessary abridgment of associational freedoms") (first quoting *Bates*, 361 U.S. at 524; then quoting *Buckley*, 424 U.S. at 25); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (holding that infringement of the right to associate "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms"). Thus, there is no doubt that the *NAACP v. Alabama* test—requiring a compelling government interest, a substantial relation between the sought disclosure and that interest, and narrow tailoring so the disclosure does not infringe on First Amendment rights more than necessary—remains applicable for cases arising outside of the electoral context, where a plaintiff needs its crucial protection against forced disclosures that threaten critical associational rights.

## C

Until recently, the circuit courts, including the Ninth Circuit, have agreed that *NAACP v. Alabama* is still good law, and they have applied it when considering state action

that has the effect of burdening individuals' First Amendment
rights by requiring disclosure of associational information.[1]
In *Familias Unidas v. Briscoe*, for instance, the Fifth Circuit
struck down a Texas statute that empowered a county judge
to compel public disclosure of the names of organizations that
interfered with the operation of public schools. 619 F.2d 391,
394 (5th Cir. 1980). In that case, the judge had compelled
disclosure of the names of Mexican-American students and
adults who were members of a group seeking reform of the
Hondo public schools. The Fifth Circuit recognized that the
Supreme Court had upheld compulsory disclosures of
membership lists only when the underlying state interest is
compelling and legitimate, and the disclosure requirement is

---

[1] *See, e.g.*, *United States v. Comley*, 890 F.2d 539, 543–44 (1st Cir.
1989) ("Once [a prima facie showing of First Amendment infringement]
is made, the burden then shifts to the government to show both a
compelling need for the material sought and that there is no significantly
less restrictive alternative for obtaining the information."); *Wilson v.
Stocker*, 819 F.2d 943, 949 (10th Cir. 1987) ("The law must be
substantially related to a compelling governmental interest, and must be
narrowly drawn so as to be the least restrictive means of protecting that
interest."); *Humphreys, Hutcheson, & Moseley v. Donovan*, 755 F.2d
1211, 1222 (6th Cir. 1985) (upholding the challenged provisions in part
because they "are carefully tailored so that first amendment freedoms are
not needlessly curtailed"); *Clark v. Library of Cong.*, 750 F.2d 89, 94
(D.C. Cir. 1984) ("[T]he government must demonstrate that the means
chosen to further its compelling interest are those least restrictive of
freedom of belief and association."); *Master Printers of Am. v. Donovan*,
751 F.2d 700, 705 (4th Cir. 1984) ("To survive the 'exacting scrutiny'
required by the Supreme Court, . . . the government must show that the
disclosure and reporting requirements are justified by a compelling
government interest, and that the legislation is narrowly tailored to serve
that interest."); *see also Perry v. Schwarzenegger*, 591 F.3d 1147,
1159–61 (9th Cir. 2010); *Dole v. Serv. Emps. Union, AFL-CIO, Local
280*, 950 F.2d 1456, 1461 (9th Cir. 1991); *Brock v. Local 375, Plumbers
Int'l Union of Am.*, 860 F.2d 346, 350 (9th Cir. 1988).

"drawn with sufficiently narrow specificity to avoid impinging more broadly upon First Amendment liberties than is absolutely necessary." *Id.* at 399 (citing *Buckley*, 424 U.S. at 68).

Our cases have likewise remained faithful to *NAACP v. Alabama*. For example, *Brock v. Local 375, Plumbers International Union of America* recognized that once a plaintiff shows that disclosure will result in "harassment, membership withdrawal, or discouragement of new members," or otherwise chill associational rights, heightened scrutiny applies: the government must demonstrate that the information sought "is rationally related to a compelling governmental interest," and that the disclosure requirement is the least restrictive means of obtaining that information. 860 F.2d 346, 350 (9th Cir. 1988) (citing *Buckley*, 424 U.S. at 64, 68; *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). We reaffirmed this approach in *Perry v. Schwarzenegger*, where we emphasized that "[i]nfringements on [the freedom to associate] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." 591 F.3d 1147, 1159 (9th Cir. 2010) (quoting *Roberts*, 468 U.S. at 623).[2]

In recent years, a few outliers have emerged and broken from the uniform application of *NAACP v. Alabama* when considering challenges to government-required disclosure. We applied *Buckley*, rather than *NAACP v. Alabama*, in two

---

[2] Although these cases cite both to *Buckley* and to cases setting out the *NAACP v. Alabama* test, *see, e.g.*, *Brock*, 860 F.2d at 350, they remain faithful to the principles of *NAACP v. Alabama* by applying its heightened scrutiny and requiring narrow tailoring.

cases involving state disclosure requirements outside the electoral context. *See Ams. for Prosperity Found. v. Harris*, 809 F.3d 536, 538–39 (9th Cir. 2015) (per curiam) ("*AFPF I*"); *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312–14 (9th Cir. 2015) ("*CCP*"). The Second Circuit has also recently applied *Buckley*'s test—without a narrow tailoring requirement—to a challenge to a government disclosure requirement outside of the electoral context. *See Citizens United v. Schneiderman*, 882 F.3d 374, 382, 385 (2d Cir. 2018). But none of these outliers offered a convincing rationale for extending *Buckley* outside of the electoral context. Equally important, none addressed a situation in which a plaintiff showed a reasonable probability of threats or hostility in the event of disclosure, *see Schneiderman*, 882 F.3d at 385; *AFPF I*, 809 F.3d at 541; *CCP*, 784 F.3d at 1314, which is a threshold requirement for the application of *NAACP v. Alabama*'s test. Accordingly, these cases do not bear on whether *NAACP v. Alabama*'s standard must be applied when a plaintiff does make such a showing, regardless whether the application of *Buckley* is appropriate outside of the electoral context.

## II

The facts of this case make clear that the Foundation is entitled to First Amendment protection under *NAACP v. Alabama* and that California's disclosure requirement cannot be constitutionally applied to the Foundation.

The Americans for Prosperity Foundation is a conservative organization dedicated to "educating and

training citizens to be advocates for freedom."[3]  It develops educational programs to "share knowledge and tools that encourage participants to apply the principles of a free and open society in their daily lives."[4]

People publicly affiliated with the Foundation have often faced harassment, hostility, and violence, as shown by the evidence adduced at trial in this case.  For example, supporters have received threatening messages and packages, had their addresses and children's school addresses posted online in an effort to intimidate them, and received death threats.  One blogger posted a message stating he contemplated assassinating a Foundation supporter:  "I'm a trained killer, you know, courtesy of U.S. taxpayers, and it would be easy as pie to . . . take [him] out."  In the same vein, a consultant working for the Foundation posted threats of physical violence against Foundation employees.  On a different blog site, a person claiming that he worked at the Foundation posted that he was "inside the belly of the beast," and could "easily walk in and slit [the Foundation CEO's] throat."

Foundation supporters have also been subjected to violence, not just threats.  For instance, at a rally in Michigan, several hundred protestors wielding knives and box cutters surrounded the Foundation's tent and sawed at the tent ropes until they were severed.  Foundation supporters were caught under the tent when it collapsed, including elderly supporters

---

[3] Ams. for Prosperity Found., http://americansforprosperityfoundation.org (last visited March 11, 2019).

[4] *Id.*

who could not get out on their own. At least one supporter was punched by the protestors.

Opponents of the Foundation have also targeted its supporters with economic reprisal. For instance, after an article published by *Mother Jones* magazine in February 2013 revealed donor information, protesters called for boycotts of the businesses run by six individuals mentioned in the article. Similarly, Art Pope, who served on the Foundation's board of directors, suffered boycotts of his business.

Given this history of harassment, the Foundation was reluctant to make information about its donors public. This concern became acute in 2010, when California suddenly decided to enforce a long dormant disclosure law.

California law requires any entity that wishes to register as a charitable organization to submit a multitude of tax forms to the state. *See* Cal. Code Regs. tit. 11, § 301. Among other requirements, California requires charitable organizations to file a confidential federal tax form, Schedule B to IRS Form 990, which contains the names and addresses of any donors who meet certain criteria. *See id.*; 26 U.S.C. § 6033(b); 26 C.F.R. § 1.6033-2(a)(2)(iii)(a). Under its regulations, California may release Schedule B only in response to a search warrant or as needed in an enforcement proceeding brought against a charity by the Attorney General. *See* Cal. Code Regs. tit. 11, § 310(b). But as discussed below, the state's confidential information is so vulnerable to hacks and inadvertent disclosure that Schedule B information is effectively available for the taking.

In light of the Foundation's confidentiality concerns, from 2001 to 2010, it registered as a charity in California without

submitting the donor information its Schedule B contains.**[5]** Over that entire period, California did not request the Foundation's Schedule B or list the Foundation's registration as a charity as deficient in any way. *See AFPF II*, 903 F.3d at 1006–07.

In 2010, California suddenly increased its efforts to collect charities' Schedule Bs, and in 2013 the state notified the Foundation that its registration was deficient because it had not submitted Schedule B donor information. *See id.* at 1006. In an effort to protect its donors from likely threats and hostility as backlash for their affiliation with the Foundation, it filed suit seeking to enjoin California from enforcing this requirement against it.

After a multi-day trial, the district court ruled that the First Amendment protects the Foundation from forced disclosure of its donor information,**[6]** and it entered a permanent injunction against California's enforcement of the Schedule B requirement as applied to the Foundation. *See Ams. for Prosperity Found.*, 182 F. Supp. 3d at 1059.

---

**[5]** The Foundation's Schedule B includes the names and addresses of any person who donated more than 2 percent of the Foundation's annual contributions. *See* 26 C.F.R. § 1.6033-2(a)(2)(iii)(a).

**[6]** The district court initially entered a preliminary injunction against California's enforcement against the Foundation. *See AFPF II*, 903 F.3d at 1006. A panel of our court reversed in part on the ground that the Foundation had not shown evidence of past hostility toward Foundation donors or a reasonable probability of future hostility. *See AFPF I*, 809 F.3d at 539–41. On remand, the Foundation presented evidence of both. *See Ams. for Prosperity Found.*, 182 F. Supp. 3d 1049.

III

The panel reversed, holding that California's interest in Schedule B information was "sufficiently important" and that there was a substantial relation between the requirement and the state's interest. *AFPF II*, 903 F.3d at 1008 (quoting *Doe*, 561 U.S. at 196). In reaching this conclusion, the panel made crucial factual and legal errors.

The panel's legal error is evident. Although this case arose outside of the election context, and the Foundation established that its members might be exposed to harassment and abuse if their identities were made public, the panel mistakenly applied *Buckley*'s "exacting scrutiny" and rejected the Foundation's argument that a narrow tailoring requirement applied in this context. *See AFPF II*, 903 F.3d at 1008–09.

The panel's factual errors are equally egregious. As a general rule, appellate courts may not override the facts found by a district court unless they are clearly erroneous. In our circuit, "we will affirm a district court's factual finding unless that finding is illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). Here, the panel not only failed to defer to the district court, but reached factual conclusions that were unsupported by the record.

First, the district court held that disclosure of the Schedule B information to the state could result in the names of the Foundation's donors being released to the public. *See Ams. for Prosperity Found.*, 182 F. Supp. 3d at 1057. The district court squarely rejected the state's argument that no

donor information disclosed to the state would be *publicly* disclosed because it would remain confidential on the state's servers. *See id.* The evidence produced at trial in this case provided overwhelming support for the court's findings. There was ample evidence of human error in the operation of the state's system. State employees were shown to have an established history of disclosing confidential information inadvertently, usually by incorrectly uploading confidential documents to the state website such that they were publicly posted. Such mistakes resulted in the public posting of around 1,800 confidential Schedule Bs, left clickable for anyone who stumbled upon them. *AFPF II*, 903 F.3d at 1018. And the public did find them. For instance, in 2012 Planned Parenthood become aware that a complete Schedule B for Planned Parenthood Affiliates of California, Inc., for the 2009 fiscal year was publicly posted; the document included the names and addresses of hundreds of donors.

There was also substantial evidence that California's computerized registry of charitable corporations was shown to be an open door for hackers. In preparation for trial, the plaintiff asked its expert to test the security of the registry. He was readily able to access every confidential document in the registry—more than 350,000 confidential documents—merely by changing a single digit at the end of the website's URL. *See AFPF II*, 903 F.3d at 1018. When the plaintiff alerted California to this vulnerability, its experts tried to fix this hole in its system. Yet when the expert used the exact same method the week before trial to test the registry, he was able to find 40 more Schedule Bs that should have been confidential.

In rejecting the district court's factual conclusions, the panel violated our standard of review as well as common

sense. The panel concluded that in the future, all Schedule B information would be kept confidential. It reasoned that because the state technician was able to fix the security vulnerability exposed by the Foundation's expert, "[t]here is no evidence to suggest that this type of error is likely to recur." *Id.* at 1018. The panel did not address the fact that even a week before trial, the state could not prevent a second disclosure based on the same security vulnerability. Further, the panel claimed that despite the state's long history of inadvertent disclosure of Schedule B information through human error, the state's new efforts to correct human errors through additional "procedural quality checks" and "a system of text-searching batch uploads before they are scanned to the Registry site to ensure none contains Schedule B keywords" would obviate future disclosures. *Id.* But no evidence supports this claim, and it is contrary to any real-world experience.

Second, the district court found that the state did not have a strong interest in obtaining the Schedule B submissions to further its enforcement goals. Instead, it held that California's up-front Schedule B submission requirement "demonstrably played no role in advancing the Attorney General's law enforcement goals for the past ten years." *Ams. for Prosperity Found.*, 182 F. Supp. 3d at 1055. Indeed, California could not point to "even a single, concrete instance in which pre-investigation collection of a Schedule B did anything to advance the Attorney General's investigative, regulatory or enforcement efforts." *Id.* The panel rejected this well-supported finding based solely on the conclusory, blanket assertions made by state witnesses that up-front disclosure of donor names increases "investigative efficiency." *AFPF II*, 903 F.3d at 1010. Yet the Supreme Court has made clear that a state's "mere assertion" that there

was a substantial relationship between the disclosure requirement and the state's goals is not enough to establish such a relationship. *See Bates*, 361 U.S. at 525; *Gibson*, 372 U.S. at 554–55. And the record does not otherwise support the panel's conclusion.

Finally, the district court found ample evidence that Foundation supporters would likely be subject to threats or hostility should their affiliations be disclosed. *See Ams. for Prosperity Found.*, 182 F. Supp. 3d at 1055–56. But based on its unsupported assumption that public disclosure would not occur, the panel felt justified in disregarding this well-supported conclusion. *AFPF II*, 903 F.3d at 1017.

Given the panel's erroneous factual determinations that there would be no public disclosure of Foundation donors and that California's disclosure requirement was substantially related to its enforcement goals, and its mistaken legal decision that no narrow tailoring was required, it is not surprising that the panel easily arrived at the conclusion that the donors were not entitled to any protection of their First Amendment rights.

IV

But contrary to the panel, the full protection of *NAACP v. Alabama* was warranted in this case, because the Foundation's donors may be exposed to harassment and abuse if their identities are disclosed, and the special considerations regarding government-required disclosures for elections are not present. *See, e.g.*, *Primus*, 436 U.S. at 432; *Brock*, 860 F.2d at 350. Had the panel properly recognized *NAACP v. Alabama*'s applicability, it would have considered (1) whether California presented a compelling interest that is

(2) substantially related to the disclosure requirement, and (3) whether the requirement was narrowly tailored to the articulated interest.  *See* 357 U.S. at 462–63; *Gibson*, 372 U.S. at 546; *Gremillion*, 366 U.S. at 297.

Applying the correct test, it is clear that California failed to show that its Schedule B disclosure requirement is "substantially related" to any interest in policing charitable fraud.  A state's "mere assertion" that there was a substantial relationship between the disclosure requirement and the state's goals is not enough to establish such a relationship, *see Bates*, 361 U.S. at 525; *Gibson*, 372 U.S. at 554–55, and the district court's well-supported factual findings establish that the Schedule Bs are rarely used to detect fraud or to enhance enforcement efforts.

Nor is California's disclosure requirement narrowly tailored; rather, the means "broadly stifle fundamental personal liberties" and "the end can be more narrowly achieved."  *Gremillion*, 366 U.S. at 296 (quoting *Shelton*, 364 U.S. at 488).  The state requires blanket Schedule B disclosure from every registered charity when few are ever investigated, and less restrictive and more tailored means for the Attorney General to obtain the desired information are readily available.  In particular, the Registry can obtain an organization's Schedule B through a subpoena or a request in an audit letter once an investigation is underway without any harm to the government's interest in policing charitable fraud. Moreover, the state failed to provide any example of an investigation obscured by a charity's evasive activity after receipt of an audit letter or subpoena requesting a Schedule B, although state witnesses made assertions to that effect.  *See AFPF II*, 903 F.3d at 1010–11.  The panel's erroneous application of *Buckley* led it to ignore this requirement

completely, and it demanded no explanation from California for why such a sweeping disclosure requirement—imposed before the state has any reason to investigate a charity—is justified given equally effective, less restrictive means exist. *See id.* at 1011–12.

Accordingly, under the proper application of the test to the facts found by the district court, the Foundation was entitled to First Amendment protection of its donor lists. Because California failed to show a substantial relation between its articulated interest and its disclosure requirement, and because it failed to show that the requirement was narrowly tailored, California's Schedule B disclosure requirement fails the test provided by *NAACP v. Alabama*, and it should have been struck down as applied to the Foundation.

The panel's contrary conclusion eviscerates the First Amendment protections long-established by the Supreme Court. By applying *Buckley* where *NAACP v. Alabama*'s higher standard should have been triggered, the panel lowered the bar governments must surmount to force disclosure of sensitive associational ties. Under the panel's standard, a state's self-serving assertions about efficient law enforcement are enough to justify disclosures notwithstanding the threats, hostility, and economic reprisals against socially disfavored groups that may ensue. And by rejecting the district court's factual findings that disclosed donor lists will become public and expose individuals to real threats of harm, the panel imposes a next-to-impossible evidentiary burden on plaintiffs seeking protection of their associational rights. Indeed, if the Foundation's evidence is not enough to show that California cannot adequately secure its information, no plaintiff will be able to overcome a state's empty assurances. "The possibility

of prevailing in an as-applied challenge provides adequate protection for First Amendment rights only if . . . the showing necessary to obtain the exemption is not overly burdensome." *Doe*, 561 U.S. at 203 (Alito, J., concurring).

V

In short, the panel's conclusion is contrary to the reasoning and spirit of decades of Supreme Court jurisprudence. Under the panel's analysis, the government can put the First Amendment associational rights of members and contributors at risk for a list of names it does not need, so long as it promises to do better in the future to avoid public disclosure of the names. Given the inability of governments to keep data secure, this standard puts anyone with controversial views at risk. We should have reheard this case en banc to reaffirm the vitality of *NAACP v. Alabama*'s protective doctrine, and to clarify that *Buckley*'s watered-down standard has no place outside of the electoral context.

The First Amendment freedom to associate is vital to a functioning civil society. For groups with "dissident beliefs," it is fragile. The Supreme Court has recognized this time and time again, but the panel decision strips these groups of First Amendment protection. I dissent from our decision not to correct this error.

FISHER, PAEZ and NGUYEN, Circuit Judges, responding to the dissent from the denial of rehearing en banc:

The State of California, like the federal government, requires tax-exempt § 501(c)(3) organizations to file annual returns with regulators charged with protecting the public against charitable fraud.   Among other things, these organizations are required to report the names and addresses of their largest contributors on IRS Form 990, Schedule B. The information is provided to regulators, who use it to prevent charitable fraud, but it is *not* made public.   Both circuits to consider the question have concluded that First Amendment challenges to these requirements are subject to exacting, rather than strict, scrutiny, and both circuits have held that these requirements satisfy exacting scrutiny. *See Ams. for Prosperity Found. v. Becerra* (*AFPF II*), 903 F.3d 1000 (9th Cir. 2018); *Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018); *Ams. for Prosperity Found. v. Harris* (*AFPF I*), 809 F.3d 536 (9th Cir. 2015); *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307 (9th Cir.), *cert. denied*, 136 S. Ct. 480 (2015).   As these courts have recognized, requiring the *nonpublic* disclosure of Schedule B information comports with the freedom of association protected by the First Amendment because it allows state and federal regulators to protect the public from fraud without exposing contributors to the threats, harassment or reprisals that might follow *public* disclosure.

I

Organizations operated exclusively for religious, charitable, scientific or educational purposes are eligible for an exemption from federal and state taxes under § 501(c)(3) of the Internal Revenue Code and § 23701 of the California

Revenue & Tax Code.  Organizations avail themselves of this status to avoid taxes and collect tax-deductible contributions.

Because this favored tax treatment presents opportunities for self-dealing, fraud and abuse, organizations availing themselves of § 501(c)(3) status are subject to federal and state oversight.  Congress has required every organization exempt from taxation under § 503(c)(3) to file an annual information return (Form 990 series) with the Internal Revenue Service, setting forth detailed information on its income, expenditures, assets and liabilities, including, as relevant here, "the total of the contributions and gifts received by it during the year, and the names and addresses of all substantial contributors."     26 U.S.C. § 6033(b)(5). Organizations such as plaintiffs Americans for Prosperity Foundation and Thomas More Law Center are required to report the name and address of any person who contributed the greater of $5,000 or 2 percent of the organization's total contributions for the year.    *See* 26 C.F.R. § 1.6033-2(a)(2)(iii)(a).  An organization with $10 million in annual revenue, for example, must report contributors who have given in excess of $200,000 for the year.  Between 2010 and 2015, the Thomas More Law Center was required to report no more than seven contributors; Americans for Prosperity Foundation was required to report no more than 10 contributors – those contributing over $250,000. Organizations report this information on IRS Form 990, Schedule B.

This information is reported not only to the IRS but also to state regulators.  California's Supervision of Trustees and Charitable Trusts Act requires the Attorney General to maintain a registry of charitable organizations and authorizes the Attorney General to obtain "whatever information, copies

of instruments, reports, and records are needed" for the registry's "establishment and maintenance." Cal. Gov't Code § 12584. To solicit tax-deductible contributions from California residents, an organization must maintain membership in the registry, *see id.* § 12585, and as one condition of registry membership, charities must submit a complete copy of the IRS Form 990 they already file with the IRS, including Schedule B, *see* Cal. Code Regs. tit. 11, § 301.

This contributor information is *not* made public. *See* 26 U.S.C. § 6104(d)(1)(A)(i), (3)(A); Cal. Gov't Code § 12590; Cal. Code Regs. tit. 11, § 310. The California Attorney General keeps Schedule Bs in a separate file from other submissions to the registry and excludes them from public inspection on the registry website. *See AFPF II*, 903 F.3d at 1005. Only information that does not identify a contributor is available for public inspection.

## II

Some § 501(c)(3) organizations object to the Schedule B reporting requirement. They argue that by submitting their Schedule B information to regulators, they expose their major contributors to threats, harassment and reprisals – from those regulators and from the public – which in turn discourages contributions. They argue, therefore, that this requirement violates the freedom of association protected by the First Amendment.

The two federal appellate courts to have addressed the issue, ours and the Second Circuit, have rejected these claims. *See AFPF II*, 903 F.3d 1000; *Schneiderman*, 882 F.3d 374; *AFPF I*, 809 F.3d 536; *Ctr. for Competitive Politics*, 784 F.3d 1307. These courts have agreed that exacting rather than

strict scrutiny applies, *see AFPF II*, 903 F.3d at 1008; *Schneiderman*, 882 F.3d at 381–82; *AFPF I*, 809 F.3d at 541; *Ctr. for Competitive Politics*, 784 F.3d at 1312, and that the Schedule B requirement survives exacting scrutiny, because the requirement serves an important governmental interest in preventing charitable fraud without imposing a substantial burden on the exercise of First Amendment rights.

The dissent from the denial of rehearing en banc challenges these decisions, arguing that a form of strict scrutiny applies and that California's Schedule B requirement is unconstitutional. In our view, the dissent's arguments are not well taken.

III

The bulk of the dissent is devoted to the argument that we erred by applying exacting scrutiny. According to the dissent, First Amendment challenges to disclosure requirements are subject to two different tests:

1.  In the electoral context, "exacting scrutiny" applies. This "standard requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Doe v. Reed*, 561 U.S. 186, 196 (2010) (citations and internal quotation marks omitted).

2.  Outside the electoral context, "heightened scrutiny" applies. This standard requires (1) a "compelling interest," (2) "a substantial relationship between the

information sought and the compelling state interest"
and (3) narrow tailoring. Dissent at 5. The dissent
refers to this strict-scrutiny-like test as "heightened
scrutiny" or the "*NAACP v. Alabama* test."

This case does not arise in the electoral context. Hence,
according to the dissent, we should have applied the dissent's
proposed "heightened scrutiny" test rather than exacting
scrutiny. Had we done so, the dissent says, we would have
invalidated California's Schedule B requirement.

We respectfully disagree with the dissent's contention
that First Amendment challenges to disclosure requirements
are subject to two different tests. In our view, there is only a
single test – exacting scrutiny – that applies both within and
without the electoral context. This test originated in *NAACP
v. Alabama*, 357 U.S. 449 (1958), and the other Civil Rights
Era cases – *Bates v. City of Little Rock*, 361 U.S. 516 (1960),
*Shelton v. Tucker*, 364 U.S. 479 (1960), *Louisiana ex rel.
Gremillion v. NAACP*, 366 U.S. 293 (1961), *Gibson v. Fla.
Legislative Investigation Comm.*, 372 U.S. 539 (1963) – and
has been applied more recently in *Buckley v. Valeo*, 424 U.S.
1 (1976), *Doe* and other cases arising in the electoral context.
As *Doe* explains, the exacting scrutiny test:

> requires a substantial relation between the
> disclosure requirement and a sufficiently
> important governmental interest. To
> withstand this scrutiny, the strength of the
> governmental interest must reflect the
> seriousness of the actual burden on First
> Amendment rights.

561 U.S. at 196 (citations and internal quotation marks omitted).

Whereas strict scrutiny requires a compelling interest and narrow tailoring in every case, the interest and tailoring required under exacting scrutiny varies from case to case, depending on the actual burden on First Amendment rights at stake: the governmental interest must be "*sufficiently* important" to justify the "*actual burden* on First Amendment rights" in the case at hand. *Id.* (emphasis added). Thus, where the burden that a disclosure requirement places on First Amendment rights is great, the interest and the fit must be as well. *See, e.g.*, *Buckley*, 424 U.S. at 25 ("Even a *significant* interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." (emphasis added) (internal quotation marks omitted)); *Gibson*, 372 U.S. at 546 ("Where there is a *significant* encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." (emphasis added) (quoting *Bates*, 361 U.S. at 524)); *Gremillion*, 366 U.S. at 296 ("[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that *broadly* stifle fundamental personal liberties when the end can be more narrowly achieved." (emphasis added) (quoting *Shelton*, 364 U.S. at 488)); *Shelton*, 364 U.S. at 488 (same); *Bates*, 361 U.S. at 524 ("Where there is a *significant* encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." (emphasis added) (citing *NAACP v. Alabama*, 357 U.S. 449)); *see also* R. George Wright, *A Hard Look at Exacting Scrutiny*, 85 UMKC L. Rev. 207, 210 (2016). But where, as

here, the actual burden is slight, a weaker interest and a looser fit will suffice.

The dissent's contention that there are two different tests is based on the premise that *NAACP v. Alabama* applied something other than exacting scrutiny. We are not persuaded. First, the Supreme Court has already told us that *NAACP v. Alabama* applied exacting scrutiny: "Since *NAACP v. Alabama* we have required that the subordinating interests of the State must survive exacting scrutiny." *Buckley*, 424 U.S. at 64. Second, there is simply no way to read *NAACP v. Alabama* as applying anything other than the exacting scrutiny test described in *Doe*. The only question the Court decided in *NAACP v. Alabama* was whether the state had "demonstrated an interest in obtaining the disclosures it seeks from petitioner which is *sufficient to justify the deterrent effect* which we have concluded these disclosures may well have on the free exercise by petitioner's members of their constitutionally protected right of association." *NAACP v. Alabama*, 357 U.S. at 463 (emphasis added). The disclosure requirement failed solely because "Alabama has fallen short of showing a controlling justification for the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have." *Id.* at 466. There is no light between the test applied in *NAACP v. Alabama* and the one described in *Doe*.

In sum, we properly applied exacting scrutiny.

IV

The dissent also challenges our conclusion that California's Schedule B requirement survives exacting scrutiny. As noted, a disclosure requirement withstands

scrutiny under this test if the strength of the governmental interest reflects the seriousness of the actual burden on First Amendment rights. *See Doe*, 561 U.S. at 196. Here, the state's strong interest in collecting Schedule B information justifies the modest burden that nonpublic disclosure places on the exercise of First Amendment rights.

## A. *Strength of the Governmental Interest*

With respect to the state's interest in collecting Schedule B information, the evidence was undisputed that the state uses Schedule B information to investigate charitable fraud. *See AFPF II*, 903 F.3d at 1011. "Current and former members of the Charitable Trusts Section, for example, testified that they found the Schedule B particularly useful in several investigations over the past few years, and provided examples. They were able to use Schedule B information to trace money used for improper purposes in connection with a charity serving animals after Hurricane Katrina; to identify a charity's founder as its principal contributor, indicating he was using the research charity as a pass-through; to identify self-dealing in that same charity; to track a for-profit corporation's use of a non-profit organization as an improper vessel for gain; and to investigate a cancer charity's gift-in-kind fraud." *Id.* Circuits have consistently recognized the strength of this interest. *See, e.g.*, *Schneiderman*, 882 F.3d at 384; *Ctr. for Competitive Politics*, 784 F.3d at 1311, 1317.

The evidence also was undisputed that up-front collection of Schedule B information provides the only effective means of obtaining the information. State regulators testified that attempting to obtain a Schedule B from a regulated entity *after* an investigation begins is ineffective "[b]ecause it's time-consuming, and you are tipping the charity off that they

are about to be audited." *AFPF II*, 903 F.3d at 1010. Using a subpoena or audit letter "would tip them off to our investigation, which would allow them potentially to dissipate more assets or hide assets or destroy documents, which certainly happened several times; or it just allows more damage to be done to [the] charity." *Id.*; *accord Ctr. for Competitive Politics*, 784 F.3d at 1317.

Although the district court questioned the strength of the governmental interest, it did so by applying an erroneous legal standard, requiring the state to establish that up-front collection of Schedule B information was the least restrictive means of obtaining the information, *see Ams. for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049, 1053–55 (C.D. Cal. 2016), and that it would be impossible for the state to regulate charitable organizations without collecting Schedule B information, *see Thomas More Law Ctr. v. Harris*, No. CV 15-3048-R, 2016 WL 6781090, at *2 (C.D. Cal. Nov. 16, 2016). By applying the wrong legal standard, the district court abused its discretion, *see United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc), and disregarded a previous ruling by this court in this very case, *see AFPF I*, 809 F.3d at 541 (rejecting a least restrictive means test).

## B. *Actual Burden on First Amendment Rights*

To determine the actual burden on First Amendment rights, we looked at two questions: (1) the likelihood that the plaintiffs' Schedule B contributors would face threats, harassment or reprisals *if* their Schedule B information were made public and (2) the likelihood that the information would become public. *See AFPF II*, 903 F.3d at 1015.

We ultimately declined to reach any conclusion with respect to the first question. *See id.* at 1017. The evidence on that question was mixed. Neither plaintiff, for example, identified a single contributor who would withhold financial support based on the plaintiffs' compliance with California's Schedule B disclosure requirement. *See id.* at 1014. The Thomas More Law Center, moreover, has consistently *over*-reported contributor information on its Schedule B filings, undermining its contention that reporting deters contributions. *See id.* Furthermore, many of the plaintiffs' Schedule B contributors are already publicly known. Private foundations, for example, are required by law to publicly disclose their contributions to the plaintiffs. *See id.* at 1015. Other Schedule B contributors – such as Charles and David Koch – are already publicly identified with the plaintiffs. In addition, although the evidence showed that individuals who are associated with the plaintiffs, such as the Koch brothers, have faced threats or harassment based on their controversial activities, the plaintiffs "presented little evidence bearing on whether harassment has occurred, or is likely to occur, simply because an individual or entity provided a large financial contribution to the Foundation or the Law Center." *Id.* at 1016 & n.6. In 2013, the National Journal published copies of the Foundation's Schedule Bs, but the Foundation presented no evidence that contributors suffered retaliation as a result. *See id.* at 1017.

Ultimately, because California, like the federal government and other states, requires only the *nonpublic* disclosure of Schedule B information, we did not need to decide whether, *in the event of public disclosure of the Schedule B information*, the plaintiffs' Schedule B contributors were likely to encounter threats, harassment or reprisals. *See id.* at 1017. We acknowledged the risk of

inadvertent public disclosure based on past confidentiality lapses by the state. *See id.* at 1018. We explained, however, that "[t]he state's past confidentiality lapses [were] of two varieties: first, human error when Registry staff miscoded Schedule B forms during uploading; and second, a software vulnerability that failed to block access to a plaintiff's expert as he probed the Registry's servers for flaws during this litigation." *Id.* at 1018. We explained that the software problem stemmed from a third-party vendor, had been "quickly remedied" and was not "likely to recur." *Id.* With respect to the problem of human error, we explained that

> the Registry Unit has implemented stronger protocols to prevent human error. It has implemented "procedural quality checks . . . to sample work as it [is] being performed" and to ensure it is "in accordance with procedures on handling documents and [indexing them] prior to uploading." It has further implemented a system of text-searching batch uploads before they are scanned to the Registry site to ensure none contains Schedule B keywords. At the time of trial in 2016, the Registry Unit had halted batch uploads altogether in favor of loading each document individually, as it was refining the text-search system. After forms are loaded to the Registry, the Charitable Trusts Section runs an automated weekly script to identify and remove any documents that it had inadvertently misclassified as public. There is also no dispute that the Registry Unit immediately removes any information that an

organization identifies as having been misclassified for public access.

*Id.* There was no evidence that these "cybersecurity protocols are deficient or substandard as compared to either the industry or the IRS, which maintains the same confidential information." *Id.* at 1019.

We also emphasized that we were addressing an *as-applied* challenge. *See id.* The key question, therefore, was not whether there was a "risk of inadvertent disclosure of *any* Schedule B information in the future," but rather whether there was a significant "risk of inadvertent disclosure of *the plaintiffs'* Schedule B information in particular." *Id.* There can be no question that this risk – which the district court failed to consider – is exceedingly small, so the plaintiffs did not show "a reasonable probability that the compelled disclosure of [their major] contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Buckley*, 424 U.S. at 74. The state's interest in obtaining the plaintiffs' Schedule B information therefore was sufficient under *Doe* to justify the modest burden on First Amendment rights. *See AFPF II*, 903 F.3d at 1019.

V

Our colleagues sensibly declined to rehear this case en banc. Our decision to apply exacting scrutiny is consistent with Supreme Court precedent, *see Doe*, 561 U.S. at 196; *Buckley*, 424 U.S. at 64, *NAACP v. Alabama*, 357 U.S. at 463, Ninth Circuit precedent, *see Ctr. for Competitive Politics*, 784 F.3d at 1312–13, and out-of-circuit precedent, *see Schneiderman*, 882 F.3d at 381–82. Likewise, our conclusion

that the Schedule B reporting requirement survives exacting scrutiny is consistent with both Ninth Circuit and out-of-circuit precedent. *See Schneiderman*, 882 F.3d at 383–85; *Ctr. for Competitive Politics*, 784 F.3d at 1312–17. Although only two circuits have addressed the issue, they have uniformly held that nonpublic Schedule B reporting requirements satisfy the First Amendment because they allow state and federal regulators to protect the public from charitable fraud *without* subjecting major contributors to the threats, harassment or reprisals that could flow from public disclosure.